

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR-77,175-05

### EX PARTE RANDY ETHAN HALPRIN, Applicant

### ON APPLICATION FOR WRIT OF HABEAS CORPUS
### CAUSE NO. W01-00327-T(B) IN THE 283RD JUDICIAL DISTRICT COURT
### DALLAS COUNTY

HERVEY, J., delivered the opinion of the Court in which RICHARDSON, NEWELL, WALKER, and MCCLURE, JJ. joined. RICHARDSON, J., filed a concurring opinion in which NEWELL and WALKER, JJ., joined. YEARY, J., filed a concurring opinion. KELLER, P.J., filed a dissenting opinion in which KEEL and SLAUGHTER, JJ., joined.

## O P I N I O N

We filed and set this cause to consider Applicant Randy Ethan Halprin's claim that his trial judge was biased against him at the time of trial because Halprin is Jewish, which violated Halprin's right to the free exercise of his religion and his Fourteenth Amendment right to due process of law. Based upon our independent review of the record and role as the ultimate factfinder in habeas proceedings, we conclude that Halprin is entitled to a

new trial based on a violation of his right to due process. Specifically, we find that Halprin has shown by the preponderance of the evidence that his trial judge was actually biased against him at the time of trial because Halprin is Jewish.

The record shows that Halprin and six other inmates (the "Texas Seven") escaped from prison in December 2000. These escapees murdered Irving Police Officer Aubrey Hawkins during a robbery at an Oshman's sporting goods store on Christmas Eve 2000. As a result of this incident, Halprin was charged with capital murder. *See* TEX. PENAL CODE ANN. § 19.03(a). In 2003, a jury convicted Halprin of this offense, and the trial court, the Honorable Vickers Cunningham presiding, sentenced Halprin to death pursuant to the jury's answers to the special issues submitted at the punishment phase. *See* TEX. CODE CRIM. PROC. Art. 37.0711, § 3(b), (e), (g).[1]

We affirmed Halprin's conviction and sentence on direct appeal, *Halprin v. State*, 170 S.W. 3d 111 (Tex. Crim. App. 2005), denied relief on his initial Article 11.071 habeas application, and dismissed three additional pleadings that we deemed to be subsequent applications, *see Ex parte Halprin*, Nos. WR-77,175-01 through -04 (Tex. Crim. App. Mar. 20, 2013) (not designated for publication). In 2005, Judge Cunningham resigned from the bench to run for Dallas County District Attorney.

After the federal courts rejected Halprin's attempt to obtain federal habeas relief, the trial court set Halprin's execution for October 2019. Shortly after the setting of that

---

[1] Unless otherwise noted, all references to "Articles" in this opinion refer to the Texas Code of Criminal Procedure.

execution date, Halprin filed the present subsequent writ application in the trial court, raising two claims. In Claim 1, Halprin alleged that Judge Cunningham's "bias against [] Halprin because he is Jewish violated [] Halprin's right to the free exercise of his religion and his Fourteenth Amendment right to due process of law." In Claim 2, Halprin alleged that "[t]he future-dangerousness special issue in the Texas capital-sentencing scheme is void for vagueness under the Due Process Clause of the Fourteenth Amendment." We determined that Claim 1, the judicial bias allegation, satisfied Article 11.071, Section 5(a)'s requirements. We accordingly remanded Claim 1 to the convicting court ("the habeas court") for review and stayed Halprin's execution pending resolution of the allegation. *Ex parte Halprin*, No. WR-77,175-05 (Tex. Crim. App. Oct. 4, 2019) (not designated for publication).

On second remand, the habeas court held a live evidentiary hearing at which the parties presented testimony from a total of eleven witnesses.[2] Eight of these witnesses testified about their personal experiences with Judge Cunningham before, during, and after Halprin's trial. The remaining three witnesses offered testimony as experts in: the history of the Jewish community in Dallas; the history of racist ideas, including anti-

---

[2] On initial remand, the habeas court made findings of fact and conclusions of law recommending that this Court grant Halprin relief on Claim 1, in the form of a new trial. In making these findings, conclusions, and recommendation, the habeas court relied on written declarations from various individuals and then the clerk returned the case to this Court. Determining that a live hearing was necessary in this case, we remanded this cause to the habeas court for that purpose. *Ex parte Halprin*, No. WR-77,175-05 (Tex. Crim. App. May 11, 2022) (not designated for publication).

Semitism; and cognitive bias in judicial decision-making. At the live hearing, the State subjected Halprin's evidence to vigorous adversarial testing. After the hearing, the State filed a supplemental response in which it agreed that the hearing testimony was sufficient to show, by a preponderance of the evidence, that Judge Cunningham was actually biased against Halprin at the time of trial because Halprin is Jewish.

Following the live hearing, the habeas court adopted Halprin's proposed findings of fact and conclusions of law virtually verbatim and once again recommended that Halprin receive habeas relief. While we agree that Halprin is entitled to a new trial, we decline to adopt any of the habeas court's findings and conclusions, which exclusively reflect Halprin's interpretation of the evidence, are often unsupported, and exceed the scope of our remand orders. Instead, we take on our role as the ultimate factfinder in habeas cases and dispose of Halprin's judicial bias allegation based upon our independent review of the record. *See Ex parte Reed*, 271 S.W.3d 698, 728 (Tex. Crim. App. 2008). ("The case may arise where the nature and number of unsupported findings and conclusions may render the findings and conclusions wholly unreliable and beyond repair. Under such circumstances, we may elect to take it upon ourselves to conduct all of the factfinding and to issue a ruling explaining our application of the law to the facts.").

"Due process guarantees 'an absence of actual bias' on the part of a judge." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)); *see also Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997) ("[T]he

Due Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case.") (internal citations and quotation marks omitted). Where the judge is not impartial, the error is structural and immune to harmless error analysis. *Fulminante*, 499 U.S. at 309–10 ("The entire conduct of the trial from beginning to end is obviously affected . . . by the presence on the bench of a judge who is not impartial.") (citing *Tumey*, 273 U.S. 510). Thus, where a judge's actual subjective bias against a defendant is established, the defendant is entitled to a new trial without a showing of harm. *Fulminante*, 499 U.S. at 309.

The evidence adduced in these habeas proceedings concerning Halprin's judicial bias claim consists primarily of anti-Semitic statements attributed to Cunningham that, according to the witnesses, he made in generally private or semi-private settings rather than from the bench in open court or in chambers. We find instructive what the United States Supreme Court has said in the context of actual-bias challenges arising from judicial comments made in the courtroom:

> [J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, [255 U.S. 22 (1921)], a World War I espionage case against German-American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German

Americans" because their "hearts are reeking with disloyalty." *Id.*, at 28
(internal quotation marks omitted). *Not* establishing bias or partiality,
however, are expressions of impatience, dissatisfaction, annoyance, and
even anger, that are within the bounds of what imperfect men and women,
even after having been confirmed as federal judges, sometimes display. A
judge's ordinary efforts at courtroom administration -- even a stern and
short-tempered judge's ordinary efforts at courtroom administration --
remain immune.

*Liteky v. United States*, 510 U.S. 540, 555–56 (1994) (emphasis in original). We discern

no reason that *Liteky*'s basic reasoning about actual judicial bias (evidenced by in-court

speech and behavior) should not also apply to a judge's pervasive patterns of speech and

behavior outside of the courtroom.[3]

With *Liteky*'s reasoning in mind, we turn to the evidence elicited in these habeas

proceedings. Although there is reason to approach some of the testimony given by

Halprin's habeas witnesses with a healthy dose of skepticism, the uncontradicted

evidence in this case is that:

- From adolescence up to the time Cunningham began working professionally in the legal system, he used derogatory language regarding Jews of his acquaintance. And Cunningham—apparently unironically—repeated unsupported anti-Semitic narratives, such as the ideas that Jews as a group have all the money and run the banking system.

- Once Cunningham began working in the legal system, he continued to use derogatory language about Jews in general and those remarks became even more offensive ("Goddamn Jews," "filthy Jews"). Further, Cunningham referred to specific Jewish people as "Fucking Jew," "kike," and "goddamn kike." Cunningham continued to use this kind of language (outside of the courtroom) when he became a judge, with "great hatred, [and] disgust" and increasing

---

[3] We emphasize the *pervasive* nature of the such speech and behavior. Our opinion should not be read to apply to one-off, ill-considered comments made in a judge's private life.

intensity as the years passed.

• In mid-October 2001, Cunningham learned that he had been appointed to preside in the court where five of the Texas Seven members would be tried for capital murder. About a month later, Cunningham stated that the appointment was significant "because [he was] going to get them all the death penalty, even the driver because he's guilty." Each of these defendants (Donald Newbury, Joseph Garcia, Michael Rodriguez, Halprin, and Patrick Henry Murphy) was in fact convicted of capital murder and sentenced to death in Cunningham's court.

• Halprin, whose capital murder trial occurred in June 2003, is Jewish, and Cunningham was aware of that fact. Halprin's Jewish faith was mentioned during both the guilt and punishment phase testimony.

• During and after Halprin's trial, Cunningham made offensive anti-Semitic remarks about Halprin in particular and Jews in general.

• Following Cunningham's November 2005 resignation from the bench, he ridiculed Jewish donors who financially supported his political campaign for Dallas County District Attorney, including a Jewish former judge with whom Cunningham has a longstanding, ostensibly cordial personal and professional relationship.

• According to expert testimony, it is not inconsistent with negative bias to have a friend or two who belong to the group that is the target of the negative bias.

• While not necessarily evidence of anti-Semitism in and of itself, Cunningham created an irrevocable living trust for his children in 2010 that financially rewarded them only if they married a white Christian person of the opposite sex.

• When Cunningham's daughter dated a Jewish man after the establishment of the trust, Cunningham disapproved. After his daughter broke up with the Jewish man, Cunningham expressed happiness that the relationship had ended and he referred to the man using an anti-Semitic phrase.

The uncontradicted evidence supports a finding that Cunningham formed an opinion about Halprin that derived from an extrajudicial factor—Cunningham's poisonous anti-Semitism. Cunningham's references to Halprin are not to "the fucking

[murderer]" or "the filthy [criminal]" or "the [murderer] Halprin," which might be fairly said to derive from the evidence presented at Halprin's capital murder trial. Rather, Cunningham's derogatory references to Halprin are expressly tied to Halprin's Jewish identity. *Cf. Liteky*, 510 U.S. at 555 (explaining that judicial remarks during the course of trial *may* support a bias or partiality challenge if they reveal an opinion that derives from an extrajudicial source or factor).

Besides deriving from an extrajudicial factor, the uncontradicted evidence "reveal[s] such a high degree of [] antagonism as to make fair judgment impossible." *Cf. id.* We cannot discern a principled difference between the comments found to establish actual bias in *Berger* (in a trial involving German-American defendants, expressing the opinion that the "hearts" of German-Americans "are reeking with disloyalty") and the derogatory references that Cunningham is said to have made at the time of trial about Halprin (a Jewish defendant) and Jews in general.[4]

In sum, we find that Halprin has shown by a preponderance of the evidence that Judge Cunningham was actually biased against him at the time of trial because Halprin is Jewish. We accordingly grant Halprin a new trial based on a structural due process violation, and remand this cause to the trial court for further proceedings in keeping with

---

[4] Because a showing of a judge's actual bias reflects structural error and entitles the applicant to relief without a showing of harm, *Fulminante*, 499 U.S. at 309, we need not and we do not determine whether the actual bias demonstrated in this case manifested itself in Judge Cunningham's rulings during Halprin's trial.

this opinion. We dismiss Claim 2, Halprin's challenge to the constitutionality of the future

dangerousness special issue, as an abuse of the writ.

Delivered: November 6, 2024
Publish